**ESTATE OF Lillian G. BERG, Joan Berg Mullen as Executrix of the Will of Lillian G. Berg, deceased,**

v.

**The UNITED STATES.**

No. 310–78.

United States Court of Claims.

Aug. 25, 1982.

George J. Noumair, New York City, attorney of record, for plaintiff. Whitman & Ransom, Gerald D. Groden, Michael T. Kiesel, and Lawrence Chanen, New York City, of counsel.

Michael V. Marino, Arlington, Mass., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Theodore D. Peyser, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and NICHOLS, Judge.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This breach of contract case is before us on the parties' cross-motions for summary judgment. Defendant has admitted that its failure to redeem United States Treasury Bonds (flower bonds) at par value when tendered in payment of estate taxes constituted a breach. Therefore, the sole issue before us is the proper measure of damages

flowing from defendant's breach. For the following reasons, we hold that plaintiff is entitled to $62,491.23 in damages for defendant's breach of contract.

## I

The facts that are material to our decision are not in dispute. On October 7, 1974, Lillian G. Berg, the decedent, died owning $700,000 par value United States Treasury Bonds, 4⅛ percent, due May 15, 1994. At the time of her death, the bonds had a fair market value (fmv) of $496,562.50. These bonds had, however, a redemption at par privilege so long as they were redeemed in payment of federal estate taxes. *See generally, Girard Trust Bank v. United States,* 221 Ct.Cl. 134, 136–37 n.1, 602 F.2d 938, 940 n.1 (1979). Acting upon this privilege, decedent's representative timely filed, on July 7, 1975, decedent's federal estate tax return which indicated that estate taxes of $910,069.56 were due. This figure was later adjusted to $905,333.10. In payment of decedent's federal estate tax liability, decedent's representative tendered, concurrent with the filing of the return, a check for $205,910.93, and a receipt from the Federal Reserve in the amount of $704,158.63, representing the $700,000 par value of the bonds and $4,158.63 in accrued coupon interest. At time of tender, the bonds had a fmv of $564,375.

Thereafter, an internal discrepancy within the Department of Treasury arose. The Bureau of Public Debt refused to redeem the bonds at par in payment of decedent's federal estate taxes. The Internal Revenue Service (IRS), on the other hand, valued the bonds at par for estate tax purposes. On July 15, 1975, decedent's representative notified the Bureau of Public Debt that neither she nor her agent would accept return of the bonds until the discrepancy was properly resolved.

On or about October 20, 1976, reissued bonds were returned to decedent's representative with accrued coupon interest of $37,181.51, representing interest from July 7, 1975 to October 20, 1976. On October 20, 1976, the bonds had a fmv of $600,685.50.

After the bonds were returned, the IRS valued the bonds in the estate at $496,562.50, their fmv on decedent's date of death. As a result of the new valuation, decedent's estate tax liability was reduced to $817,953.91. The check for $205,910.93 having already been tendered, an underpayment of federal estate tax in the amount of $612,042.98 resulted. Plaintiff paid, by check, this federal estate tax underpayment on November 4, 1976. On November 9, 1976 and December 23, 1976, decedent's estate paid to the IRS a total of $51,426.93, representing deficiency interest on the unpaid balance for the July 7, 1975—November 9, 1976 period.

After the bonds were returned to plaintiff, plaintiff distributed some of the bonds to the beneficiaries of the estate. Between November 3, 1976 and January 17, 1977, the estate and beneficiaries sold all of the bonds for an aggregate sum of $573,850.

## II

■ The general rule in common law breach of contract cases is to award damages that will place the injured party in as good a position as he or she would have been had the breaching party fully performed. *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 875, 524 F.2d 707, 713 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976) (citing RESTATEMENT OF CONTRACTS § 329, Comment a at 504 (1932)); *J. D. Hedin Construction Co. v. United States,* 197 Ct.Cl. 782, 803, 456 F.2d 1315, 1327–28 (1972); *G. L. Christian & Associates v. United States,* 160 Ct.Cl. 1, 312 F.2d 418, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). This is the general rule; there are qualifications to it we encounter in part III. To put plaintiff in as good a position as it would have been had the contract been fully performed, the bonds must now be constructively redeemed at par value or $700,000. The parties are in agreement that the proper measure of plaintiff's actual damages is to subtract the fmv of the bonds from the $700,000 par value and award the difference to plaintiff. The parties are in dispute, however, as to what date fmv should be established.

■ Plaintiff argues that fmv should be established as of the date of defendant's breach, July 7, 1975. Defendant agrees that the breach occurred on July 7, 1975, but asserts that fmv should be established as of the date the bonds were returned to the estate, October 20, 1976.

It is well established that the date of breach is the proper date for establishing fmv. "As a general rule, our law has adopted the standard of market value at *the time and place of the failure to perform* as the basis for measuring the compensation to which the injured promisee is entitled." J. MURRAY, CONTRACTS § 237 (2d rev. ed. 1974) (emphasis supplied); 5 A. CORBIN, CONTRACTS § 1039 (1951); C. McCORMICK, DAMAGES § 44 (1935). Under this rule, fmv of the bonds should be established as of July 7, 1975, the date of breach.

In a simple breach case in which the property or goods to be purchased remained with the injured party, this principle would be self-evident. The injured party would have something valued at the market price in his or her possession and would realize, in damages, the difference in value between the market price and contract price. In this manner, the injured party would be placed in as good a position as he or she would have been had the contract been fully performed.

Our difficulties with the instant case, however, lie in the fact that, at the time of breach, plaintiff did not possess the bonds. Indeed, the breaching party maintained possession of the bonds. Defendant asserts that this factual difference requires us to detour from the general rule and hold that fmv should be established as of the date of the return of the bonds to the estate, instead of generating added liability, as might seem more rational. We do not agree. The property tendered and eventually returned was not ordinary fungible goods. It was defendant's own obligation or its tangible written evidence. Defendant held and failed to return the evidence of its own obligation. This effects a difference from the ordinary case of breach by a vendee, which requires a correspondingly independent approach in the assessment of damages.

Plaintiff tendered the bonds for redemption on July 7, 1975. The bonds were not returned to the estate until October 20, 1976. During this 15½ month time period, the bonds increased in value in excess of $36,000. Because defendant maintained possession of the bonds, plaintiff was unable to reap the benefits of the bonds' increased value. Yet under defendant's theory, the government does so, though the wrongdoer. This is so because if date of return was used to establish fmv, the increased fmv of the bonds would then be deducted from the bonds' par value, thereby reducing plaintiff's damages. To allow date of return, in the instant case, to establish fmv of the bonds would result in the party committing the breach being able to select the most advantageous date of return, depending on the market, in order to minimize damages owed to the injured party. The realities of such a situation are further demonstrated by the fact that between November 3, 1976, 13 days after the government's return of the bonds, and January 17, 1977, the bonds decreased in value. The court will not countenance such a result and, accordingly, fmv is established as of date of breach, fixing defendant's liability without further reference to the fluctuating worth attached by investors to defendant's obligations.

The dissent would have us fix a fmv as of the date of return to avoid a windfall to plaintiff. It poses an imaginary or hypothetical case where the value had declined on the return date of the reissue bonds, in which case our method of determining a fmv would do plaintiff an injustice.

Indeed it would, but the hypothetical can be readily disposed of as impossible. Plaintiff did not have to take the bonds back at all, and of course would not have in the case posed by the dissent. Defendant might have returned the bonds without consent if it had given notice it was holding them pending a ruling as to their acceptability, held them in some kind of escrow, and instead of cancelling them, as it did here,

returned the identical bonds it had received. Not having done these things, though the bonds were in fact properly tendered at their $700,000 maturity value and legally acceptable, therefore, defendant was able to return them only by consent. The return was in law an offer accepted by receipt of the reissue bonds without protest, and subsequent dealing with them by plaintiff as its own.

Since, therefore, plaintiff did not have to take them, the proffer and acceptance were in the nature of a partial stipulated settlement of the case, a contract implied in fact, altering the terms of the original offer.

As with other contracts implied in fact, the terms of the contract were not stated and at least in part must be inferred: the only sure thing was that plaintiff took the reissue bonds back as, and in lieu of, the originals. The other implied term might have been argued to be that the return of the bonds was made and accepted in full settlement of the controversy over use of the bonds in payment of estate taxes. Defendant has not argued for this, so we need not state the many reasons why such an argument if made would be untenable. It was therefore a partial settlement without prejudice. The terms of the partial settlement might be along two lines. One might be that the bonds were tendered at their then value in partial settlement of the claim. This is the position of the dissent. The other is that the bonds were tendered by defendant with a view to restoring the situation that would have obtained if defendant had rejected the bonds immediately on receipt and left plaintiff free to deal with them as its own thenceforward. This is the position of the majority.

We may note again that plaintiff had a perfected money claim against defendant well before the date of actual return. Defendant could not return the bonds as partial settlement of the claim, except by consent. The Constitution would not permit a forced acceptance of a long-term debt obligation in payment of an immediate claim for money.

Plaintiff would naturally have noticed the inclusion with the reissue bonds on October 20, 1976, of the interest coupons that had become payable since July 7, 1975. It would construe that as indicating an intent by defendant to elect the second alternative as stated above, i.e., to restore the July 7, 1975, situation.

With or without these coupons, plaintiff hardly would have been induced to accept the reissue bonds at all if defendant had stated it was tendering them in partial settlement at their then value. Then defendant took all the speculative benefits from the rise of the bonds in value. What had plaintiff to gain by voluntary acceptance? For nothing it assumed the onus of either holding the bonds to their 1994 maturity or else obliging defendant by marketing them for defendant, for no commission or other compensation.

On the other hand, if the intention was to restore the situation as of July 7, 1975, there was something in it for everybody. Plaintiff got the benefit of the subsequent increment in value of the bonds as compensation for having to market them. Defendant refloated its long-term debt obligation in partial settlement of a short-term obligation to pay money, a thing it cannot often do.

We think such a settlement, if expressly spelled out, would have been acceptable to both sides, on the further assumption, of course, that both sides reserved without prejudice their respective positions respecting the availability of the bonds to pay estate taxes of $700,000, on which issue both sides still expected to prevail in court.

Therefore we think overwhelming probability supports the view that on October 20, 1976, the parties did not intend the tender of the bonds to be in partial settlement at their then fmv, but did intend that the tender would recreate the situation that would have obtained if defendant had unequivocally refused the bonds on July 7, 1975. Our use of a fmv of that date effectuates that intent and is therefore proper.

### III

■ Having determined that fmv is to be established as of the date of breach, we now turn to the collateral damage issues that have been raised. First, plaintiff asserts that it should be entitled to an upward adjustment in damages for the defendant's wrongful withholding of the bonds for 15½ months after the breach. Plaintiff would quantify this damage by subtracting the 4⅛ percent interest the bonds bore from the market rate of interest, resulting in increased damages of $28,192. Defendant disputes plaintiff's assertion that the government wrongfully withheld the bonds and further states that plaintiff is actually claiming interest for the lost use of its money during the 15½ month period. Defendant correctly points out that 28 U.S.C. § 2516(a) precludes the United States from paying this type of interest in the absence of an express contract or statute. Because no contract or statute allows this sort of interest, defendant argues that plaintiff is not entitled to this upward adjustment.

We agree with defendant's position that plaintiff is not entitled to interest in the absence of an express contract or statute. Because no express contract or statute exists which would allow interest to be paid, plaintiff is not entitled to this requested upward adjustment.

As further support for denying plaintiff's claim, we would also argue that our denial comports with the theory of the case. As we said before, the general rule in common law breach of contract cases is to place the injured party in as good a position as he or she would have been had the breaching party fully performed. *Northern Helex v. United States, supra; J. D. Hedin Construction Co. v. United States, supra; G. L. Christian & Associates v. United States, supra.* Under this theory, we determined that fmv of the bonds is to be determined as of date of breach. This is so because if the contract had not been breached, plaintiff would not have had the bonds or their equivalent value in its possession. Similarly, if the contract had been fully performed, plaintiff would not have suffered any loss or injury because the bonds or their equivalent value would not have generated income to them because not in its possession. Because plaintiff has suffered no injury, compensatory damages for this nonexistent injury cannot be awarded.

■ Next, plaintiff asserts it is entitled to recover the deficiency interest of $51,-426.93 which was assessed and paid by plaintiff for late payment of federal estate taxes. Plaintiff argues that if the bonds had been properly redeemed when tendered on July 7, 1975, plaintiff would have timely paid its federal estate taxes and, hence, would not have been assessed any deficiency interest. Defendant says that plaintiff is entitled to recover the deficiency interest because the assessment was a direct and foreseeable consequence of defendant's breach. *Hadley v. Baxendale,* 156 Eng.Rep. 145 (1854). We agree with the parties that the assessment of deficiency interest was a proximate, direct, and foreseeable consequence of defendant's breach and plaintiff is entitled to recover the deficiency interest paid.

Defendant argues that in returning plaintiff to the same financial condition it would have been had the bonds been properly redeemed, the amount paid to plaintiff in coupon interest for the July 7, 1975 to October 20, 1976 time period should be offset against plaintiff's damages. We agree. Under our general rule, we must endeavor to put the injured party in the same financial position as it would have been had the contract been fully performed. Accordingly, if the bonds had been properly redeemed on July 7, 1975, plaintiff would no longer own the bonds and, hence, would not be entitled to any coupon interest which vested after July 7, 1975.

It is important to note that neither party has raised any argument regarding the $4,158.63 in coupon interest that accrued prior to July 7, 1975. Neither party has told us whether plaintiff did in fact receive the $4,158.63 in coupon interest or had the amount credited toward federal estate taxes. Having failed to raise a claim for coupon interest in either its complaint or mo-

tion for summary judgment, plaintiff is deemed to have waived any claim it may have had.

We must also offset the $87,379.19 estate tax saving plaintiff realized by virtue of the fact that the bonds were valued in the estate at $496,562.50 rather than $700,000. Putting plaintiff in the same financial position it would have been had the bonds been properly redeemed requires the bonds to be valued in the estate at $700,000, thereby increasing the estate's federal tax liability by $87,379.19.

■ Plaintiff also asserts that it should be able to recover losses suffered for various other events that would not have occurred had defendant not breached the contract. These events include a sale of Schering Plough stock which plaintiff alleges would not have been sold to pay the estate's debts if it had been known the bonds would be dishonored. Instead, plaintiff maintains the bonds would have been sold to pay the estate's debts. Because the value of the Schering Plough stock rose in value by 25 percent between date of sale and the date the estate tax return was due, plaintiff claims $125,000 in losses is due it. Plaintiff also argues that it is entitled to damages for the injury it incurred with respect to the taxable treatment of the bonds. Because the bonds were valued in the estate at their fmv ($496,562.50) on date of decedent's death rather than par value ($700,-000) and the bonds were sold by the distributees at a substantial taxable gain for income tax purposes, the distributees have been injured in that they would have realized a capital loss of $126,150 rather than a capital gain of $77,254. Plaintiff also argues that other state and local tax effects should be included in the calculation of plaintiff's damages. The injuries suffered through the sale of Schering Plough stock and the federal, state, and local tax treatment were either not proximately caused by the breach or were not foreseeable to the breaching party at the time the contract was made and, hence, under the rule of *Hadley v. Baxendale, supra,* are not recoverable. *See Myerle v. United States,* 33 Ct.Cl. 1, 25–27 (1897).

■ Finally, plaintiff claims damages for attorneys' fees incurred in resolving this dispute. While it is true plaintiff would not have incurred such a large legal services bill if it had not been for defendant's breach, "it is [nevertheless] well-settled that in the absence of specific statutory authority, expenses incurred in litigation, whether legal, accounting, secretarial or other, are not award[ed against the United States]." *Kania v. United States,* 227 Ct.Cl. ——, ——, 650 F.2d 264, 269, *cert. denied,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1981) (see cases cited therein).

Under the Equal Access to Justice Act, 28 U.S.C. § 2412 (Supp. IV 1980), attorneys' fees may be awarded against the United States if the government's conduct in litigating the issue is reprehensible in some manner. *Papson v. United States,* Ct.Cl. No. 602–80T (order entered June 18, 1982). In *Papson,* we held that the government's refusal to accept "flower bonds" in payment of estate taxes, although incorrect, was not reprehensible. Our *Papson* decision is controlling here and plaintiff is not entitled to recover its attorneys' fees.

To recap, plaintiff is entitled to recover the following:

1. $700,000 (par value) less $564,375 (fmv as of July 7, 1975).

2. Adjusted by adding $51,426.93 (deficiency interest assessment).

3. Adjusted by subtracting $37,181.51 (coupon interest for July 7, 1975 through October 20, 1976).

4. Adjusted by subtracting $87,379.19 (amount saved in estate taxes by incorrect fmv of bonds).

## IV

Upon the findings and foregoing opinion, the court concludes as a matter of law that plaintiff is entitled to recover damages in the amount of $62,491.23 for defendant's breach of contract, and judgment in that amount is entered for plaintiff.

FRIEDMAN, Chief Judge, dissenting in part:

The problem in determining damages in this case stems from two facts: (1) the

flower bonds had a special value, substantially above their market value, when used to pay estate taxes, and (2) the market value, but not the special value, of these particular bonds changed between the time the plaintiff tendered the bonds to the United States in partial satisfaction of the estate tax liability and the time the government returned the bonds to the plaintiff after it had refused to redeem them at face value in satisfaction of that liability.

The method of calculating damages the court applies in part II of its opinion does not, in my view, take proper account of these facts. In applying the traditional breach of contract damages formulation to the significantly different situation here, the court has awarded greater damages than I think the plaintiff is entitled to receive.

The court properly recognizes that the touchstone for determining damages is to put the plaintiff as closely as possible in the same situation in which it would have been if the government had not breached its contractual obligation to accept the bonds at their face value of $700,000 in partial payment of the estate tax liability. I part company with the court, however, in the amount necessary to accomplish that objective.

1. If the government had honored its contractual commitment to accept the bonds at their face value of $700,000 in partial payment of the estate tax liability, the plaintiff would have paid only $205,-333.10 to satisfy fully that liability ($905,-333.10 minus $700,000, see part I of the majority's opinion). Actually, however, the plaintiff was required to pay $817,953.91 (the reduction being due to revaluation of the bonds) to discharge that tax liability and $51,426.93 to cover deficiency interest, for a total of $869,380.84. Because of the government's breach, then, the plaintiff was required to pay an additional $664,-047.74.

There must be subtracted from that additional payment, however, any amounts the plaintiff received that it would not have received if the government had accepted the bonds. *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 875–76, 524 F.2d 707, 713–14 (1975); 5 A. CORBIN, CORBIN ON CONTRACTS §§ 1038, 1041 (3d ed. 1968); J. MURRAY, MURRAY ON CONTRACTS § 221, p. 442 n.18 (2d ed. 1974).

There were two such items: (i) the accrued interest on the returned bonds from the date of tender to the date of return, of $37,181.51, and (ii) the fair market value of the bonds, which on the date of return was $600,685.50. The bonds should be valued as of the date of return because that was the first time after tender at which the plaintiff could obtain their fair market value by selling them. The increase in market value while the government held the bonds therefore reflected an additional amount the plaintiff received that was attributable to the government's breach. The plaintiff thus received $637,867.01 as a direct consequence of the government's breach.

The difference between the total additional payment of $664,047.74 the plaintiff made and the $637,867.01 additional it received is $26,180.73. That amount would put the plaintiff in the same situation it would have been in if the government had not breached the contract. In my opinion that is the proper measure of the damages to which it is entitled.

2. Even if one accepts the court's approach in determining damages, I cannot agree that the plaintiff's recovery should be calculated on the basis of the fair market value of the bonds on the date of tender. I think the bonds should be valued as of the date on which the government returned them to the plaintiff.

The rule the court applies—that the person injured is entitled to receive the difference between the contract price and the "market value at the time and place of the failure to perform"—is derived from cases in which a buyer refuses to accept goods that a seller tenders. In that situation, the seller normally never relinquishes possession of the goods and so immediately can resell them at their fair market price; therefore, it is made whole if it receives as damages the difference between the con-

tract price and the market price as of the date of tender.

The rule, which section 2–708(1) of the Uniform Commercial Code adopts, has been criticized when applied in situations where there is a substantial delay between the tender of the goods and the buyer's rejection of them during which interval the market value of the goods has changed. *See* Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two*, 73 Yale L.J. 199, 258–59 (1963); J. MURRAY, *supra* at § 242, pp. 488–89 n.18. Such an application yields damages bearing no resemblance to the plaintiff's injury. *Peters, supra*, 73 Yale L.J. at 258–59. Furthermore, in that situation determining market value as of the date of tender improperly shifts the risk of market fluctuation from the breaching party to the innocent victim of the breach.

In the present case, the rule the court applies—determining damages on the basis of the market value of the bonds on the date of tender—has the same unfortunate effect. If the value of the bonds increases between the time of tender and return, as it did in the present case, the plaintiff will have a windfall because it receives more than it could have expected had there been no breach. As explained in part 1, it cost the plaintiff $26,180.73 more to satisfy the estate tax liability than it would have paid if the government had not breached its contractual obligation. (This is the same amount to which the plaintiff would have been entitled using the majority's formula but substituting fair market value as of the date of return—$600,685.50—for the value on the date of tender—$564,375.) The $62,-491.23 damages the court awards thus gives the plaintiff $36,710.50 more than is necessary to make it whole.

The court seeks to justify this result on the ground that valuing the bonds on the date of return "would result in the party committing the breach being able to select the most advantageous date of return, depending on the market, in order to minimize damages owed to the injured party." The other side of this coin, however, is that valuing the bonds on the date of tender eliminates any incentive for the government to return the bonds promptly and thus to minimize its damages, since those damages have been set on the date of tender. The rule I would apply, however, does give the government an incentive to return the bonds promptly, since if the value of the bonds falls, its damages will increase.

Moreover, the court's theory would be unfair to an estate if the market price of the bonds decreased rather than increased between tender and return. In that situation the effect of valuing the bonds as of the date of tender would be to award damages that give the plaintiff less than the loss it suffered from the government's breach.

For example, assume that in the present case the value of the bonds when they were returned was not $600,000 but $500,000. In that event the plaintiff would have received from the government bonds and accrued coupon interest totaling $537,181.51, but still would have paid an additional $664,-047.74 to satisfy the estate tax liability. If the bonds were valued as of the date of return, the plaintiff would be entitled to damages of $126,866.23, which would be the amount necessary to make it whole.

Under the court's theory that fluctuation in the value of the bonds between tender and return is irrelevant, the plaintiff would receive the same damages it receives in the present case of $62,491.23. This would be less than one-half of its actual damages. The result would be that a significant portion of the injury resulting from the government's breach of the contract would be borne by the injured party instead of by the party who caused the injury. I know of no principle of damages that would countenance, let alone require, that result.